**UNITED STATES BANKRUPTCY COURT**　　　　<u>FOR PUBLICATION</u>
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
In re:　　　　　　　　　　　　　　　　　　　Chapter 11

305 EAST 61ST STREET GROUP LLC,　　　　　Case No. 19-11911 (SHL)


　　　　　　　　　　　　　　Debtor.
-----------------------------------------------------------------x
LITTLE HEARTS MARKS FAMILY II L.P.,


　　　　　　　　　　　　　　Plaintiff,

　　　　　　　vs.
　　　　　　　　　　　　　　　　　　　　　Adv. Pro. No. 21-01137 (SHL)

JASON D. CARTER and 61 PRIME LLC,


　　　　　　　　　　　　　　Defendants.
-----------------------------------------------------------------x


<u>**MEMORANDUM OF DECISION**</u>

**A P P E A R A N C E S :**

**GOLDENBERG LAW, P.C.**
*Counsel for Little Hearts Marks Family II L.P.*
　By:　Andrew R. Goldenberg, Esq.
345 Seventh Avenue, 3rd Floor
New York, New York 10001

**STAMELL & SCHAGER, LLP**
*Counsel for Little Hearts Marks Family II L.P.*
　By:　Jared B. Stamell, Esq.
260 Madison Avenue, 16th Floor
New York, New York 10016

**ALSTON & BIRD LLP**
*Counsel for Jason D. Carter and 61 Prime LLC*
　By:　Gerard S. Catalanello, Esq.
　　　　James J. Vincequerra, Esq.
　　　　Kimberly J. Kodis, Esq.
　　　　Geoffrey C. Williams, Esq.
90 Park Avenue
New York, New York 10016-1387

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are two motions filed in the above-captioned adversary proceeding (the "Adversary Proceeding"). First, the Defendants Jason Carter ("Carter") and 61 Prime LLC ("Prime") have filed a motion to dismiss the Adversary Proceeding. *See Mem. of Law in Supp. Of Mot. of Def.s' Jason D. Carter and 61 Prime LLC to Dismiss the Compl. Filed by Plaintiff Little Hearts Marks Family II L.P. Pursuant to Rules 9(b); 12(b)(1) and 12(b)(6) of the Fed. R. of Civ. Pro.* [ECF No. 5] (the "Motion to Dismiss").[1] The Defendants argue that the Plaintiff, Little Hearts Marks Family II L.P. ("Little Hearts"), lacks standing to pursue the allegations in the Complaint [ECF No. 10-7],[2] which was originally filed in New York State Supreme Court (the "State Court") during the pendency of these bankruptcy proceedings and removed by the Defendants to this Court. *See Little Hearts Marks Family II L.P. v. Jason D. Carter and 61 Prime LLC*, Index No. 652410/2021. The Defendants believe that the claims asserted in the Complaint belong to the debtor, 305 East 61st Street Group LLC. They argue that the creditor trustee appointed under the Debtor's plan of liquidation has the exclusive right to pursue those claims.

Second, the Plaintiff has filed a motion for this Court to abstain from hearing the Adversary Proceeding or to remand the Adversary Proceeding back to the State Court due to a lack of subject matter jurisdiction. *See Mem. of Law in Supp. of Pl.'s Mot to Remand to State Court Based on Lack of Subject Matter Jurisdiction or, in the Alternative, Principles of*

---

[1]    Unless otherwise noted, all Case Management/Electronic Case Filing ("ECF") references are to Adv. Proceeding No. 21-01137.

[2]    The Complaint is attached as Exhibit G to the *Decl. of Andrew R. Goldenberg in Supp. of Pl.'s Mot. to Remand, Opp. to Def.s' Mot to Dismiss and Opp. to Creditor Trustee's Mot. for Contempt,* dated July 20, 2021 (the "Goldenberg Declaration") [ECF No. 10].

*Abstention* [ECF No. 9] (the "Remand Motion").  The Plaintiff argues that the claims asserted in the Complaint relate to injuries that it suffered directly and that none of the claims seek recovery for an injury to the Debtor or involve estate assets.  For the reasons set forth below, the Defendants' motion to dismiss is granted based on a lack of standing.  Given the dismissal, the Plaintiffs' motion to abstain or remand is denied as moot.

## BACKGROUND

### A.  **The Company**

Prior to its bankruptcy filing, the Debtor operated as a New York limited liability company (the "Company") that consisted of four members: Prime, Little Hearts, Thaddeus Pollack, and Onestone 305 LLC (collectively, the "Members").  Compl. ¶ 16.  Prime held a 50% ownership interest in the Company; Mr. Carter is the sole member and manager of Prime. Compl. ¶¶ 11, 16.  Little Hearts held a 30% ownership interest in the Company; the principal of Little Hearts is Mitchell Marks ("Marks").  Compl. ¶¶ 13, 16.  Onestone and Thaddeus Pollock each held a 10% ownership interest in the Company.  Compl. ¶ 16.[3]

The Company owned a ten-story building located at 305-307 East 61st Street in Manhattan (the "Building").  Compl. ¶¶ 1, 14, 18.  The Company's only activity was conversion of the Building into a condominium (the "Project").  *Id.*  Little Hearts served as the manager of the Company and, in that capacity, was responsible for the Project from its inception in 2016 until July 2018.  Compl. ¶ 38.

The Company acquired the Building in August 2016 for $40,000,000.  Compl. ¶ 18.  The purchase of the Building was financed by a $20,000,000 acquisition loan from Banco Popular

---

[3]      Prime and Little Hearts held their interest in Class B and Onestone and Thaddeus Pollock in Class A. Compl. ¶ 16.

North America ("Banco Popular"), with another $21,328,000 in capital contributions by the Members.  Compl. ¶¶ 18, 20.  Construction of the Project was funded through a $5,186,000 construction loan from Banco Popular and an additional $4,924,000 in capital contributions by the Members, along with other amounts the Members contributed for renovations.  Compl. ¶ 19. The loans were secured by a mortgage held by Banco Popular (the "Mortgage") and were subsequently assigned to 305 East 61st Street Lender LLC (the "Lender").  Compl. ¶ 20.  The Mortgage was guaranteed by Little Hearts and Prime and a personal guarantee was provided by Mr. Carter and Mr. Marks.  Compl. ¶ 21.

Each Member of the Company signed a Subscription Agreement and an Operating Agreement.  Compl. ¶ 22.  These agreements assigned each Member a specific floor or floors in the Building and required each Member to assume responsibility for payment of a portion of the Mortgage as part of their capital contributions.  *Id*.

The Operating Agreement governed management of the Company.  Compl. ¶ 26.  It provided that each Member acquired exclusive use of one or more floors of the Building with the right to "retain, use, occupy, [and] develop" those floors.  Compl. ¶ 28 (citing Operating Agreement at ¶¶ 4(F)(i)-(ii), 9(F), 9(H)).[4]  Little Hearts acquired exclusive rights to the basement/cellar and the 1st floor (the "Ground Floor Unit"), the 2nd floor and the 10th floor and roof of the Building (collectively, the "Marks Units").[5]  Compl. ¶ 29.  The Operating Agreement also granted Little Hearts the right to make alterations to and/or sell, lease, sublease, assign, and use each of their assigned floors or a portion thereof, without the Debtor's consent and without payment of any fees or expenses to the Debtor.  Comp. ¶ 33 (citing Operating Agreement ¶

---

[4]      The Operating Agreement is attached as Exhibit A to the Goldenberg Declaration.

[5]      Prime acquired exclusive rights to the 4th, 5th, 6th, 7th and 9th floors; Mr. Pollock acquired exclusive use of the 3rd floor; and Onestone acquired exclusive use of the 8th floor.  Compl. ¶¶ 30-32.

9(F)).  Little Hearts asserts that it spent millions renovating the Marks Units for the purpose of

their use, lease, or sale.  Compl. ¶ 34.

The Operating Agreement provides Members with a certain percentage interest in the

Company, "together with the right to retain, use, occupy, develop and acquire the condominium

units" on the floors designated to each.  Operating Agreement ¶ 4(F)(i)-(ii); *see also* Operating

Agreement ¶¶ 9(F), 9(H).  The Operating Agreement also sets out a priority for the distribution

of proceeds when a unit in the Building was sold once the condominium plan was approved.  It

provides that:

> All net sales proceeds realized from the sale of any Condominium Unit comprised
> of any part of the Designated Portions shall be applied and paid as follows, and in
> the following priority: first to the amount of the Loan allocated to such floor . . .
> next to the payment of all closing expenses for the sale of such individual
> condominium unit . . . next to the payment of all sums due hereunder; and the
> balance, if any, to such Member. In no event shall any Condominium Unit be
> conveyed unless all costs set forth above are paid.

Operating Agreement ¶ 21.2.

The Operating Agreement further granted the right to a proposed twenty-five year lease

for the Ground Floor Unit from the Company as landlord to Little Hearts as tenant.  Compl. ¶ 35

(citing Operating Agreement ¶ 9(G)).  This lease was entered into by the Company and Little

Hearts in August 2016 (the "Lease"); Little Hearts subsequently subleased the ground floor unit

to non-party Acqua Ancien Bath New York, Inc. (the "Spa") for a term of 15 years (the

"Sublease").  Compl. ¶¶ 36-37.  The Company consented to the sublease.  Compl. ¶ 37.

**B.  Prepetition Litigation**

In Spring 2018, the Company—under the management of Little Hearts—filed a lawsuit

against Prime in the State Court (the "Little Hearts Action").  Compl. ¶ 39 (citing *305 East 61st*

*Street Group LLC v. 61 Prime LLC*, Index No. 652934/2018).  The Little Hearts Action asserted

that Prime had refused to pay $62,500 of its original subscription to the Company.  Compl. ¶ 39.

Then in May 2018, the Company and Defendants Carter and Prime filed an action in the State Court against Little Hearts and Mitchell Marks (the "Prime Action"). Compl. ¶ 41 (citing *61 Prime LLC, et al. v. Little Hearts Marks Family II, LP, et al.*, Index No. 653281/2018). The Prime Action asserted, among other things, that Little Hearts and Marks committed wrongful acts and omissions of duties in violation of the Operating Agreement and sought to remove Little Hearts as the Company's manager. Compl. ¶ 42. In July 2018, Prime and Carter moved for a temporary restraining order in the Prime Action on an *ex parte* basis. Compl. ¶ 43. The State Court granted the request and issued a temporary restraining order that effectively removed Little Hearts as manager of the Company and substituted Prime in its place. Compl. ¶ 44. A hearing on a preliminary injunction was conducted by the State Court in February 2019, but the Debtor filed for bankruptcy before the State Court issued its decision, thereby staying the Prime Action. Compl. ¶¶ 51-54.

In August 2018, Little Hearts filed its own lawsuit against the Company and Defendants Carter and Prime in the State Court, asserting causes of action due to alleged improper removal of Little Hearts as manager of the Company and alleging mismanagement of the Property by the Defendants, including actions that interfered with the Spa. *See Little Heart Marks Family II, L.P. v. 61 Prime LLC, Jason Carter and 305 East 61st Street Group LLC*, Index No. 654198/2018 (the "Marks Action"), attached as Exhibit B to the Declaration of Gerard S. Catalanello in Support of Defendants' Motion to Dismiss Complaint (the "Catalanello Declaration") [ECF No. 6-2]. The Marks Action was also stayed by the Debtor's subsequent bankruptcy filing.

C. **Bankruptcy Filing**

In June 2019, the Company filed for protection under Chapter 11 of the Bankruptcy Code. Compl. ¶ 54. On the same day that the bankruptcy was filed, Carter incorporated a company named Lazarus 5 LLC ("Lazarus"). Compl. ¶¶ 55, 78.

Later that month, Little Hearts commenced an adversary proceeding in this Court against the Debtor that sought a declaratory judgment and injunctive relief as well as claims asserting breach of contract and breach of implied covenant of good faith and fair dealings to Plaintiff with respect to Little Hearts leasehold interest in the Building and the sublease with the Spa. *See Little Heart Marks Family II, L.P. v. 305 East 61st Street Group LLC Adversary Proceeding Complaint* [Adv. Pro. No. 19-01297, ECF No. 1].[6] The Debtor filed an answer that included counterclaims. *See First Amended Answer and Counterclaims* [Adv. Pro. No. 19-01297, ECF No. 10].

Little Heart also filed a proof of claim against the Debtor in the amount of $12,000,000 based on breach of contract and contractual indemnification under the Operating Agreement arising from what Little Heart referred to as baseless claims made against it by the Plaintiffs in the Prime Action. *See* Proof of Claim ¶ 4, attached as Exhibit D to the Catalanello Decl. [ECF No. 6-4] (the "Proof of Claim"). Then in October 2019, Little Hearts filed a motion to lift the automatic stay to proceed with the Prime Action and the Marks Action against the Defendants individually. *See Motion of Little Hearts Marks Family II, L.P. Pursuant to 11 U.S.C. § 362(d)*

---

[6]      The Court is permitted to take judicial notice of public filings on its own docket in a bankruptcy case. *See Fed. R. Evid. 201; Teamsters Nat'l Freight Indus. Negotiating Comm. et al. v. Howard's Express, Inc. (In re Howard's Express, Inc.)*, 151 F. Appx. 46, 48 (2d Cir. 2005) (stating that courts are empowered to take judicial notice of public filings, including a court's docket); *American Tissue, Inc. v. Donaldson, Lufkin & Jenrette Securities Corp.*, 351 F. Supp. 2d 79, 95 n. 17 (S.D.N.Y. 2004) ("The Court can take judicial notice of matters of public record . . . including filings in related lawsuits. . . .") (citing *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000)); *Katzenstein v. VII SV5556 Lender, LLC (In re St. Vincent's Catholic Medical Centers of New York)*, 440 B.R. 587, 599 (Bankr. S.D.N.Y. 2010).

for Relief from the Automatic Stay to (A) Proceed with Existing State Court Litigation Against Non-Debtors and (B) Commence Any New Litigation Against Non-Debtors [Case No. 19-11911, ECF No. 66] (the "Lift Stay Motion").

Given the continued warring among the various equity holders—even after the appointment of a new manager—the Court entered an order approving the appointment of a Chapter 11 trustee to administer the Debtor's bankruptcy estate pursuant to Section 1104(a)(2) of the Bankruptcy Code (the "Chapter 11 Trustee"). *See Order Appointing a Chapter 11 Trustee Pursuant to 11 U.S.C. Sections 104(a)(1) and (a)(2); and (ii) Granting Related Relief* [Case No. 19-11911, ECF No. 72].[7]  Following the appointment of the Chapter 11 Trustee, the Little Hearts' Lift Stay Motion was adjourned from time to time, during which period the Chapter 11 Trustee attempted to reach a resolution with the Plaintiff and the Defendants regarding ownership of the claims addressed in the lift stay motion.[8]  *See* Motion to Dismiss ¶ 15 [ECF No. 5].

The Chapter 11 Trustee ultimately sought to sell the Building under Section 363 of the Bankruptcy Code. *See Trustee's Motion for Entry of Order Approving (I) Purchase and Sale Agreement Between Trustee and 305 E. 61st Street Lender LLC, (II) Break-up Fee to Be Paid to Stalking Horse Bidder; (III) Bidding Procedures, and (IV) the Time, Date, Place and Form of Notice for Auction and Sale Hearing* [Case No. 19-11911, ECF No. 117]; *Trustee's Motion in Further Support of the Court's Previously Entered Bidding Procedures Order Authorizing and Approving Sale of Property Free and Clear of Liens, Claims, Interests and Encumbrances*

---

[7]      Kenneth P. Silverman, Esq. was subsequently appointed as the Chapter 11 Trustee. *See Order Approving the Appointment of Chapter 11 Trustee* [Case No. 19-11911, ECF No. 79].

[8]      The Lift Stay Motion was never heard by the Court, nor has it been withdrawn by Little Hearts, despite the eventual sale of the Building and confirmation of a plan of liquidation (as discussed below).

*Pursuant to 11 U.S.C. §§ 105(a) and 363(f)* [Case No. 19-11911, ECF No. 170].  The Court

authorized the Chapter 11 Trustee to enter into an agreement for the sale of the Building to a

stalking horse bidder, subject to higher and better offers.  Compl. ¶ 79; *Order Approving (I)*

*Purchase and Sale Agreement Between Trustee and 305 E. 61st Street Lender LLC, (II) Break-up*

*Fee to Be Paid to the Initial Bidder; (III) Bidding Procedures, and (IV) the Time, Date, Place*

*and Form of Notice for Auction* [Case No. 19-11911, ECF No. 148]; *Order Granting Trustee's*

*Motion in Further Support of the Court's Previously Entered Bidding Procedures Order*

*Authorizing and Approving Sale of Property Free and Clear of Liens, Claims, Interests and*

*Encumbrances Pursuant to 11 U.S.C. §§ 105(a) and 363(f)* [Case No. 19-11911, ECF No. 202].

An auction was conducted in August 2020, at which Lazarus was the only bidder.  Compl. ¶ 70;

*Notice of Results of Auction of Debtor's Real Property* [Case No. 19-11911, ECF No. 215].

Lazarus ultimately purchased the Building during the pendency of the Debtor's bankruptcy

proceeding for approximately $50,000,000.  Compl. ¶ 81; *Order: (i) Approving Trustee's Sale of*

*Real Property Located at 305-307 East 61st Street, New York, New York, Free and Clear of All*

*Liens, Claims, Encumbrances, and other Interests; and (ii) Granting Related Relief* [Case No.

19-11911, ECF No. 218].

In May 2020, the Trustee filed the *Chapter 11 Trustee's Plan of Liquidation under*

*Chapter 11 of the Bankruptcy Code* [Case No. 19-11911, ECF No. 171] (the "Plan"), which was

confirmed by the Court in August 2020.  *See Order Confirming Chapter 11 Trustee's Plan of*

*Liquidation Under Chapter 11 of the Bankruptcy Code* [Case No. 19-11911, ECF No. 219].  The

Plan created a Creditor Trust, into which the Debtor's remaining assets were transferred,

including all causes of action held by the Debtor.  *See* Plan at Art. V, § B(6).  Specifically, the

Plan provides, in relevant part:

> On the Effective Date, the Debtor shall transfer to the Creditor Trust all of its rights, titles, and interests in and to the Creditor Trust Assets, including, without limitation, all Avoidance Actions and Causes of Action. For avoidance of doubt, the Causes of Action shall be deemed to have been automatically assigned and transferred to the Creditor Trust on the Effective Date without the need for further conveyance or assignment document. Upon the Effective Date, the Creditor Trust shall be deemed to be substituted for, without further order of any court, the plaintiff in all Causes of Action. Any recoveries on account of the Causes of Action transferred to the Creditor Trust shall be distributed in accordance with the Plan.

*See id.*

Kenneth P. Silverman was appointed as a trustee of the Creditor Trust (the "Creditor Trustee"). *See* Plan at Art. V, § B(6); Creditor Trust Agreement § 2.2(j) [Case No. 19-11911, ECF No. 207, Ex. A] (the "Creditor Trust Agreement"). The Creditor Trustee was vested with power over the assets in the Creditor Trust and was tasked with pursuing any causes of action. *See id*. The Creditor Trust Agreement between the Debtor and the Trustee provides that upon confirmation of the Plan, the Creditor Trustee is empowered:

> [T]o act on behalf of the Creditor Trust in all adversary proceedings and contested matters (including, without limitation, any Avoidance Actions and Causes of Action) assigned to the Creditor Trust, then pending or that can be commenced in the Bankruptcy Court and in all actions and proceedings pending or commenced elsewhere, and to settle, retain, enforce, or dispute any adversary proceedings or contested matters (including, without limitation, any Causes of Action) and otherwise pursue actions involving Creditor Trust Assets that could arise or be asserted at any time under the Bankruptcy Code or otherwise, unless otherwise specifically waived or relinquished in the Plan. The Creditor Trust shall be authorized to enter into settlements of Causes of Action without a hearing or Court approval[.]

Creditor Trust Agreement § 2.2(j).

The Plan stated that all actions by creditors and interest holders involving property of the Debtor's estate, including claims and causes of action of the Creditor Trustee, were permanently

enjoined.[9] A section of the Plan provides for the Bankruptcy Court to retain jurisdiction over all

matters relating to the Plan and litigation involving the Debtor:

> Notwithstanding the entry of the Confirmation Order and the occurrence of the
> Effective Date, to the extent legally permissible, the Bankruptcy Court shall, after
> the Effective Date, retain such jurisdiction over the Chapter 11 Case and all
> Persons and Entities with respect to all matters related to the Chapter 11 Case, the
> Debtor, the Trustee, the Creditor Trust and the Plan, including jurisdiction to . . .
> [d]ecide or resolve any motions, adversary proceedings, contested or litigated
> matters and any other Causes of Action that are pending as of the Effective Date
> *or that may be commenced in the future*, and grant or deny any application
> involving the Debtor that may be pending on the Effective Date or instituted by
> the Creditor Trust after the Effective Date; provided that the Creditor Trust shall
> reserve the right to commence actions in all appropriate forums and
> jurisdictions[.]

Plan at Art. XI, § 7 (emphasis added).

In an effort to resolve the ongoing litigation and competing claims to ownership over

various causes of action, mediation was agreed to by Little Hearts, Carter and the Creditor

Trustee. But soon after that agreement to pursue mediation, Little Hearts filed this action in the

---

[9] With regard to the preservation of rights, including all causes of action not expressly sold, settled, or released, the Plan states that:

> EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, ALL ENTITIES WHO HAVE HELD,
> HOLD OR MAY HOLD CLAIMS, INTERESTS, CAUSES OF ACTION, OR LIABILITIES
> AGAINST THE DEBTOR'S ESTATE, THE TRUSTEE, THE CREDITOR TRUST, AND THE
> CREDITOR TRUSTEE SOLELY IN SUCH CAPACITY, INCLUDING BUT NOT LIMITED
> TO ANY AND ALL PROPERTY OF THE DEBTOR AND THE CREDITOR TRUST ASSETS,
> ARE PERMANENTLY ENJOINED AND PRECLUDED, FROM AND AFTER THE
> EFFECTIVE DATE, FROM: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY
> ACTION OR OTHER PROCEEDING OF ANY KIND AGAINST ANY ENTITY ENTITLED
> TO EXCULPATION UNDER THIS PLAN, ON ACCOUNT OF OR IN CONNECTION WITH
> OR WITH RESPECT TO ANY CLAIMS, INTERESTS, CAUSES OF ACTION OR
> LIABILITIES OF THE DEBTOR; (B) ENFORCING, ATTACHING, COLLECTING OR
> RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR
> ORDER AGAINST ANY ENTITY ENTITLED TO EXCULPATION ON ACCOUNT OF OR IN
> CONNECTION WITH OR WITH RESPECT TO ANY CLAIMS, INTERESTS, CAUSES OF
> ACTION OR LIABILITIES OF THE DEBTOR; (C) CREATING, PERFECTING OR
> ENFORCING ANY LIEN, CLAIM OR ENCUMBRANCE OF ANY KIND AGAINST ANY
> ENTITY ENTITLED TO EXCULPATION ON ACCOUNT OF OR IN CONNECTION WITH
> OR WITH RESPECT TO ANY SUCH CLAIMS, INTERESTS, CAUSES OF ACTION OR
> LIABILITIES OF THE DEBTOR. . .

Plan at Art. X, § E.

State Court, which was then removed by the Defendants to this Court on May 14, 2021, pursuant

to Bankruptcy Rule 9027(a)(3).  *See Notice of Removal* [ECF No. 1].

## **DISCUSSION**

### A.  **Legal Standard**

"[S]tanding is the threshold question in every federal case, determining the power of the

court to entertain the suit."  *In re Gucci,* 126 F.3d 380, 387-88 (2d Cir. 1997); *see also Breeden*

*v. Kirkpatrick & Lockhart, LLC*, 268 B.R. 704, 708 (S.D.N.Y. 2001) ("Standing . . . is a

threshold issue in all cases since putative plaintiffs lacking standing are not entitled to have their

claims litigated in federal court.").  When a plaintiff lacks standing to bring a suit, the court does

not have subject matter jurisdiction to hear their claim, and this is grounds for dismissal of a

case.  *See Cent. States Southeast & Southwest Areas Health & Welfare Fund v. Merck-Medco*

*Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005) (internal citations and quotations

omitted); *see also* Fed. R. Civ. Pro. 12(b)(1).  A court must therefore determine a plaintiff's

standing to bring its claims prior to reaching the merits of a case.  *See Steel Co. v. Citizens for a*

*Better Env't*, 523 U.S. 83, 110 (1998).

Property of the bankruptcy estate includes "all legal or equitable interests of the debtor in

property as of the commencement of the case."  11 U.S.C. § 541(a)(1).  A representative of the

bankruptcy estate, including a bankruptcy trustee, stands in the shoes of the debtor and therefore

has exclusive standing to assert causes of action belonging to the estate.  *See BRS Assocs., L.P. v.*

*Dansker*, 246 B.R. 755, 771-72 (S.D.N.Y. 2000); *see also Goldin v. Primavera Familienstiftung*

*Tag Assocs. (In re Granite Partners, L.P.)*, 194 B.R. 318, 325 (Bankr. S.D.N.Y 1996) ("Where

the trustee has standing to sue, the automatic stay prevents creditors or shareholders from

asserting the claim notwithstanding that outside of bankruptcy, they have the right to do so.").

But if a cause of action belongs solely to individual shareholders or creditors, the trustee lacks standing to assert the claim. *See id.*; *see also In re Granite Partners*, 194 B.R. at 324 (the trustee is unable to "assert the personal, direct claims of creditors for the benefit of the estate or for a particular class of creditors.").

A bankruptcy court turns to state law to determine which claims belong to the bankruptcy estate. *See St. Paul Fire & Marine Ins. Co. v. Pepsico, Inc.*, 884 F.2d 688, 700 (2d Cir. 1989). New York law distinguishes between direct and derivative claims. "A plaintiff asserting a derivative claim seeks to recover for injury to the business entity [while] [a] plaintiff asserting a direct claim seeks redress for injury to him or herself individually." *Yudell v. Gilbert*, 949 N.Y.S.2d 380, 383 (App. Div. 1st Dep't 2012). Typically, a shareholder has no individual cause of action for an alleged wrong against a business entity, even if he or she suffers injury because of that wrong and would share in the recovery. *Serino v. Lipper*, 994 N.Y.S.2d 64, 68-69 (App. Div. 1st Dep't 2014). Since only the trustee is permitted to assert claims the debtor could have brought before bankruptcy, the court must dismiss derivative claims that properly belong to the bankruptcy estate. *See St. Paul Fire & Marine Ins. Co.*, 884 F.2d at 697 ("If, under state law, a cause of action belongs to the debtor or if rights of action exist against officers, directors and shareholders of a corporation for breaches of fiduciary duties, which can be enforced by either the corporation directly or the shareholders derivatively before bankruptcy, those actions are properly asserted by the bankruptcy trustee.") (internal citations and quotations omitted).

Some New York cases look to the test formulated by the Delaware Supreme Court in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004), as a "clear and simple framework to determine whether a claim is direct or derivative." *Yudell*, 949 N.Y.S.2d at 381;

*see also Serino*, 994 N.Y.S.2d at 66.  Under this test, when determining whether a claim is direct or derivative, a court should consider:

> (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually).

*Yudell,* 949 N.Y.S.2d at 384 (quoting *Tooley*, 845 A.2d at 1033).

The first part of the test asks whether the individual or the business entity suffered the alleged harm.  *See Yudell*, 949 N.Y.S.2d at 384 (citing *Tooley*, 845 A.2d at 1035).  To maintain a direct action, the plaintiff must allege an injury to itself independent of any injury to the business entity.  *Beatrice Invs., LLC v. 940 Realty LLC*, 2018 N.Y. Misc. LEXIS 2008, *25 (Sup. Ct. N.Y. Cty. 2018); *Abrams v. Donati*, 66 N.Y.2d 951, 953 (1985) ("For a wrong against a corporation a shareholder has no individual cause of action . . . . Exceptions to that rule have been recognized when the wrongdoer has breached a duty owed to the shareholder independent of any duty owing to the corporation wronged."); *see also Serino*, 994 N.Y.S.2d at 69 (characterizing this exception as "narrow").  The Court should "look to the nature of the wrongs alleged in the complaint without regard to the [p]laintiffs' designation . . . ."  *BRS Assocs., L.P. v. Dansker*, 246 B.R. 755, 772 (S.D.N.Y. 2000).  "The fact that an individual closely affiliated with a corporation is incidentally injured by an injury to the corporation does not confer on the injured individual standing to sue on the basis of either that indirect injury or the direct injury to the corporation."  *Patterson v. Calogero*, 56 N.Y.S.3d 324, 327 (App. Div. 2d Dep't 2017).  Rather, the plaintiff "must demonstrate that the duty breached was owed to the [plaintiff] and that he or she can prevail without showing an injury to the" business entity.  *1993 Trust of Joan Cohen v. Baum*, 2017 N.Y. Misc. LEXIS 1667, at *6 (Sup. Ct. N.Y. Cty. May 2, 2017); *see also Yudell*, 949 N.Y.S.2d at 384 (noting that "plaintiffs' claim for breach of fiduciary duty is derivative, because any pecuniary loss plaintiffs suffered derives from a breach of duty and harm to the business

14

entity . . . "); *Serino*, 994 N.Y.S.2d at 70 (in holding claims were derivative, court noted that

plaintiff's damages are no different from losses suffered by any other investor and claims are

supported by the same proof).[10]

But even where the plaintiff alleges such a breach or injury, if that claim is "confused

with or embedded in" a harm to the business entity, it cannot be maintained as a direct claim.

*Serino*, 994 N.Y.S.2d at 69 (noting that "claim must be factually supportable by more than

complaints that conflate [claimant's] derivative and individual rights"); *see also Abrams v.*

*Donati*, 66 N.Y.2d at 953 ("A complaint the allegations of which confuse a shareholder's

derivative and individual rights will . . . be dismissed.").[11]

The second part of the test examines whether the individual or the business entity would

receive the benefits of recovery for the alleged harm.  *See Yudell*, 949 N.Y.S.2d at 384 (citing

*Tooley*, 845 A.2d at 1035).  A claimant "may not obtain a recovery that otherwise duplicates or

belongs to the corporation."  *Serino*, 994 N.Y.S.2d at 69.  In the bankruptcy context, this

consideration is especially important: When a plaintiff's allegations would benefit all creditors,

but a plaintiff is proceeding alone, "to allow the plaintiff's actions to proceed would undercut the

general bankruptcy policy of ensuring that all similarly-situated creditors are treated fairly."  *St.*

---

[10]      *See also MatlinPatterson ATA Holdings LLC v Federal Express Corp.*, 929 N.Y.S.2d 571, 575 (App. Div.
1st Dep't 2011) ("[C]orporations . . . exist independently from that of their shareholders, and in many cases, an
individual shareholder cannot secure a personal recovery for an alleged wrong done to a corporation. . . . The fact
that an individual closely affiliated with a corporation (for example a principal shareholder, or even a sole
shareholder), is incidentally injured by an injury to the corporation does not confer on the injured individual
standing to sue on the basis of either that indirect injury or the direct injury to the corporation. . . .  However, a
shareholder can pursue a direct claim against a third party where it appears that the injury to the shareholder resulted
from the violation of a duty owing to the shareholder from the wrongdoer, having its origin in circumstances
independent of and extrinsic to the corporate entity.") (internal citations and quotations omitted).

[11]      Courts have also held that where a party's wrong inflicts an injury to the rights of a stockholder rather than
a corporation, the stockholder may seek direct relief against that third party. *See In re Granite Partners*, 194 B.R. at
325.  This can occur "where the allegedly wrongful conduct violates a separate duty to the complaining shareholder
independent of the fiduciary duties that the wrongdoer owes to all of the shareholders, or where the conduct causes
an injury to the plaintiff distinct from any injury to the corporation." *Id.*

*Paul Fire & Marine Ins. Co.*, 884 F.2d at 697 (citing *In re S.I. Acquisition, Inc.*, 817 F.2d 1142,

1153 (5th Cir. 1987)); *see also Cohain v. Klimley,* 2010 U.S. Dist. LEXIS 98870, at *33-34

(S.D.N.Y. Sept. 20, 2010) ("Making the pursuit of certain causes of action the sole responsibility

of the trustee in bankruptcy furthers the fundamental bankruptcy policy of equitable distribution

amount creditors.") (citing *Cumberland Oil Corp. v. Thropp*, 791 F.2d 1037, 1041 (2d Cir.

1986)); *Glenn v. Hoteltron Systems, Inc.*, 74 N.Y.2d 386, 393 (1989) (awarding damages

"directly to a shareholder could impair the rights of creditors whose claims may be superior to

that of the innocent shareholder.").

　　　Recovery by the business entity in these circumstances also avoids imposing the burden

of defending a multiplicity of lawsuits by every injured shareholder on the alleged wrongdoer.

*See St. Paul Fire & Marine Ins.*, 884 F.2d at 697 (noting that "if one creditor could bring an alter

ego action outside of the bankruptcy court, all creditors could" and that staying an alter ego

action against a bankrupt corporation's parent upon the filing of bankruptcy would "prevent a

'multi- jurisdictional rush to judgment [and] . . . . a potential conflict in judgments' . . .

potentially resulting in collateral estoppel problems.") (quoting *In re S.I. Acquisition, Inc.*, 817

F.2d at 1154).  Thus, "[w]here all of a corporation's stockholders are harmed and would recover

*pro rata* in proportion with their ownership of the corporation's stock solely because they are

stockholders, then the claim is derivative in nature."  *Otoka Energy, LLC v. State Street Bank &*

*Trust Co.*, 2019 N.Y. Misc. LEXIS 3885, at *6 (Sup. Ct. N.Y. Cty. July 10, 2019) (quoting

*Feldman v. Cutaia*, 951 A.2d 727, 733 (Del. 2008)); *see also Yudell*, 949 N.Y.S.2d at 384

(holding that plaintiffs' claims were derivative where joint venture first receives compensation

and then plaintiffs would be entitled to receive their proportionate share).  On the other hand, it

would be counterproductive to allow a trustee to control the litigation where the estate's

16

"concerns are only tangential and the estate would not share any eventual recovery." *Agostino v. Hicks*, 845 A.2d 1110, 1117 (Del. 2004).

**B.  Plaintiff Lacks Standing Over the Claims**

As standing is a threshold issue, the Court will first address the Defendants' Motion to Dismiss.  The Complaint asserts six causes of action against the Defendants (each a "Cause of Action" and collectively, the "Causes of Action"): (i) Count 1 asserts a Cause of Action for breach of fiduciary duty against all Defendants; (ii) Count 2 asserts a Cause of Action for aiding and abetting breach of fiduciary duty against Defendant Carter; (iii) Count 3 asserts a Cause of Action for breach of contract against all Defendants; (iv) Count 4 asserts a Cause of Action for violation of the covenant of good faith and fair dealing against all Defendants; (v) Count 5 asserts a Cause of Action for liability as alter ego of Prime and Lazarus against Defendant Carter; and (vi) Count 6 asserts a Cause of Action for unjust enrichment against all Defendants.

An examination of the language of the Complaint and the nature of the alleged injuries demonstrates that the harms impacted the Debtor and/or all Members, not just Little Hearts individually.  The fundamental allegation by the Plaintiff is that the Defendants took control of the Company, mismanaged the Company to drive it into bankruptcy, and forced a sale of the Building to Lazarus 5.  *See, e.g.*, Compl. ¶¶ 88, 97, 106, 122.  The other allegations hang on this central narrative.  For example, the alleged breaches of fiduciary duty in Count 1 include:

- "Improperly removing Little Hearts as Manager through false representations to the Court ex parte to obtain a TRO appointing Carter and Prime as Managers without notice or a hearing to Little Hearts or any other Member."

- "Placing the Company into a Bankruptcy Proceeding and thereby staying the TRO after learning that the state court judge was about to issue an adverse ruling vacating the TRO."

- "Stopping construction at the Building, failing to renew permits, not advancing construction during the time Defendants served as Managers, and allowing the

condominium offering plan expire so that the other Members, including Little Hearts, could not proceed with construction of their units."

- "Doing unpermitted work and dangerous work against the advice of the construction manager and engineer that caused the New York City Department of Buildings to issue a stop work order and halt all work including work done by the Spa."

- "Allowing the Mortgage to mature so that Members would be responsible for paying interest at the 24% default rate without calling on the Members to pay the debt and refusing to . . . consider . . . commercially reasonable refinancing proposals presented by Marks."

- "After the Mortgage matured, Carter and Prime refused to accept the funds Members were required to pay the Mortgage pursuant to their Subscription Agreements with the Company . . . and the Notes. . . ."

- "On the day that Carter and Prime placed the Company into the Bankruptcy Proceeding, forming Lazarus 5 which purchased the Mortgage from the Lender and then forced the sale of the Building to Lazarus 5. . . . ."

Compl. ¶ 88; *see also* Compl. ¶¶ 97, 106, 115, 122 (placing the Company into bankruptcy, forming Lazarus 5 and forcing the sale of the Building to Lazarus 5). But it is well established that "[a] claim for deficient management or administration of a [company] is a paradigmatic derivative claim." *Saltz v. First Frontier, LP*, 782 F. Supp. 2d 61, 79 (S.D.N.Y. 2010) (internal citations and quotations omitted); *see also Cohain*, 2010 U.S. Dist. LEXIS 98870, at *34 (noting that claims for fraudulent conveyance, waste of corporate assets, self dealing, deepening insolvency and breach of fiduciary duty assert rights belonging to the debtor "and could be brought by any creditor of the Company; as such, they are the property of the debtor's estate in bankruptcy") (citing cases). The Plaintiff argues that the Defendants' reliance on the *Saltz* case is misplaced because it utilizes the *Tooley* test for derivative standing under Delaware law. But the Court disagrees given that New York state cases have clearly relied on the *Tooley* test when

determining a direct versus derivative claim. *See Yudell*, 949 N.Y.S.2d at 381; *Serino*, 994

N.Y.S.2d at 66.[12]

Similarly, the other counts of the Complaint are anchored in the Defendants alleged

wrongful conduct as to the Company, with effects that impacted all Members' rights.   These

---

[12]      Count 2 of the Complaint asserts a claim against Mr. Carter alone for aiding and abetting a breach of
fiduciary duty.   The allegations against Mr. Carter in Count 2 are substantially identical to those in Count 1. *See*
Compl. ¶ 97.   The claim of aiding and abetting cannot stand independent of the claim for breach of fiduciary duty.
*See Kirschner v. Bennett*, 648 F. Supp. 2d 525, 533 (S.D.N.Y. 2009) (elements of aiding and abetting a breach of
fiduciary duty include "existence of a primary violation, actual knowledge of the violation on the part of the aider
and abettor, and substantial assistance"); *Marino v. Grupo Mundial Tenedora, S.A.*, 810 F. Supp. 2d 601, 613
(S.D.N.Y. 2011) ("Under either New York of Delaware law, a claim for aiding and abetting breach of fiduciary duty
is dependent upon the underlying breach of fiduciary duty."); *see, e.g., Horan v. Vieira*, 2021 U.S. Dist. LEXIS
48421, at *23 (E.D.N.Y. Mar. 12, 2021) ("This Court has already recommended denying summary judgment on
Plaintiffs' primary breach of fiduciary duty claim . . . .   Accordingly, in the absence of a primary breach, Plaintiffs
cannot establish that there is no dispute of material fact as to the first element of their aiding and abetting claim.").
Thus, to the extent the claims in Court 1 have been dismissed, so must the claims asserted in Count 2.

other counts mirror Count 1, regardless of whether they sound in contract,[13] alter ego,[14] the

covenant of good faith and fair dealings,[15] or unjust enrichment.[16]

---

[13]     For example, Count 3 of the Complaint asserts a claim against the Defendants for breach of contract, alleging that Carter, through ownership, domination and control, caused Prime to breach the Operating Agreement. See Compl. ¶ 105.  The Complaint asserts that the Defendants breached two separate sections of the Operating Agreement, both of which relate to the Manager's duties to the Company and/or all Members generally:

- Paragraph 9(I), which requires the Manager, to "discharge the Manager's duties *to the Company and to the other Members* in good faith and with the degree of care that an ordinarily prudent person and an experienced real estate developer in a similar position would use under similar circumstances."  Operating Agreement, ¶ 9(I) (emphasis added).

- Paragraph 9(F), which states  that the Manager was "required to devote as much time as is reasonably necessary *to the management of the Company's business* to the extent of obtaining detailed proposals and bids from subcontractor and professionals which may be necessary to perform all work required to expedite the filing of alteration plans, obtaining municipal and utilities approvals and executing the alteration work in order to obtain a new certificate of occupancy for a mixed use residential/commercial, as herein contemplated and provided."  Operating Agreement, ¶ 9(F) (emphasis added).

The alleged violations in Count 3 mirror Count 1 and include:

- "Removing Little Hearts as Manager by making false representations to the [State Court] in order to obtain the TRO, without notice or a hearing."

- "Placing the Company into the Bankruptcy Proceeding, thereby staying the TRO from being vacated before [the State Court judge] issued an order vacating the TRO."

- "Stopping construction of the Building, failing to renew the permits, not advancing construction at all during the entire time Defendants served as Managers, and allowing the condominium offering plan to expire so that the other Members could not proceed with construction of their units."

- "Allowing the Mortgage to mature so that Members would be liable to pay interest at the 24% default rate and refusing to consider the commercially reasonable refinancing proposals presented by Marks."

- "After the Mortgage matured, refusing to enforce the Company's rights to require Members to pay off the Mortgage pursuant to their Subscription Agreements with the Company . . . and the Notes, which were due and payable on the same day the Mortgage matured. . . ."

- "After the Mortgage went into default . . . adding $23,000,000 in additional debt by accruing interest at the 24% per annum default rate and artificially causing a foreclosure proceeding which could have been avoided."

- "On the day that Carter caused the Company to commence the Bankruptcy Proceeding, forming Lazarus 5, which was created solely for the purpose of purchasing the Mortgage from the Lender and then forcing a sale of the Building to Carter for his own personal gain . . ."

- "Self-dealing in using Lazarus 5 to purchase the Building at the Bankruptcy sale, thereby completing Carter's strategy, relying on his vast wealth, through his domination and control of Prime to suffocate Little Hearts and wipe out its equity in order to force a sale of the Building to Carter for his own personal gain."

Compl. ¶ 106

[14]     Count 5 of the Complaint states a claim against Mr. Carter alone for liability as the alter ego of Prime and Lazarus 5.  Compl. ¶ 119.  The Complaint alleges that at the direction and under the control of Carter, Prime committed several wrongs; these wrongs once again echo those set forth in Count 1 and include:

Not surprisingly then, the damages asserted in the Complaint flow directly from the

impact of the Defendants' actions upon the Company's operations and are experienced by all

Members with respect to their own designated units.  *See, e.g.,* Compl. ¶¶ 92, 99  (lost

investment of capital and other costs and expenses into the Company and the rights Little Hearts

was granted in the Operating Agreement to "retain, use, occupy [and] develop" the Marks Units

and the loss of the total offering value of the Marks Units in the Building's condominium

offering plan at the time the Building was to be completed in 2018).  Said another way, the

Defendants' alleged mismanagement of the Company—culminating in the sale of the Building to

---

- Removing Little Hearts as Manager by making false representations to the State Court in order to obtain the TRO, without notice or a hearing.

- Placing the Company into bankruptcy, thereby staying the TRO from being vacated and avoiding an adverse ruling from the State Court judge which prevented Little Hearts from the Company's management, and selling the Building so that Carter could acquire it for his own personal gain.

- Stopping construction at the Building, failing to renew building permits, not advancing construction during the time Carter served as Manager, and allowing the condominium offering plan to expire so that the other Members, including Little Hearts, could not proceed with the completion of construction of their units.

- Allowing the Mortgage to mature so that Members would be responsible for paying interest at the 24% default rate, rejecting commercially reasonable refinancing options.

- After the Mortgage matured, refusing to enforce the Company's rights to require the Members to pay off the Mortgage pursuant to their Subscription Agreements with the Company . . . and the Notes, which were due and payable on the same day the Mortgage matured . . . .

- On the very same day that the Company commenced the Bankruptcy Proceeding, forming Lazarus 5, for the purpose of purchasing the Mortgage from the Lender and then forcing a sale of the Building to Lazarus 5 for Carter's own personal gain.

Compl. ¶ 122.

[15]    Count 4 asserts a claim for violation of the covenant of good faith and fair dealing against each of the Defendants.  The Complaint states that the "Defendants violated their obligations to act in good faith and fair dealing required as Managers by acting in their personal interests, self-dealing and acting *against the Company and other Members*."  Compl. ¶ 113 (emphasis added).  Little Heart argues that the Defendants deprived them of the benefits of the Operating Agreement and that the Defendants acted in bad faith and with corrupt dealing so that Mr. Carter could purchase the Mortgage and force a sale of the Building to Lazarus 5, instead of paying the Mortgage off as required in the Operating Agreement.  Compl. ¶¶ 114-115.

[16]    Count 6 of the Complaint asserts a claim against both of the Defendants for unjust enrichment.  The Complaint alleges that the Defendants engaged in wrongful and inequitable conduct that caused injury to the Plaintiff and that, as a result, the Defendants have been unjustly enriched.  Compl. ¶¶ 130-31.  Echoing the other counts of the Complaint, the Plaintiff's unjust enrichment claim arises from the same allegations previously asserted in the Complaint.  Compl. ¶ 128.  The Complaint states that it would be inequitable and unjust to allow the Defendants to retain the Marks Units and profit from their wrongful conduct.  Compl. ¶ 131.

Lazarus 5—resulted in harm to all equity holders, including not only the Plaintiff Little Hearts,

but also Onestone and Thaddeus Pollack.[17]  Were each equity holder permitted to pursue their

own causes of action, it would lead to a multiplicity of suits, resulting in a race to the courthouse

and also possible issues with conflicting rulings in each suit relating to the same causes of action.

*See St. Paul Fire & Marine Ins.*, 884 F.2d at 697 (noting that "if one creditor could bring an alter

ego action outside of the bankruptcy court, all creditors could" and that staying an alter ego

action against a bankrupt corporation's parent upon the filing of bankruptcy would "prevent a

'multi- jurisdictional rush to judgment [and] . . . . a potential conflict in judgments' . . .

potentially resulting in collateral estoppel problems.") (quoting *In re S.I. Acquisition, Inc.*, 817

F.2d at 1154).

 The language of the proof of claim filed by Little Hearts in the Debtor's bankruptcy case

demonstrates how inextricably interwoven the causes of action in the Complaint are with the

Debtor.  The proof of claim clearly echoes the allegations of corporate mismanagement in this

Adversary Proceeding:

> [I]f it is determined that Prime and Mr. Carter are not individually liable to
> Claimant for their actions or inactions, the Claimant asserts claims against
> the Debtor for monetary damages arising from the Debtor's breaches of the
> Operating Agreement by, *inter alia*, failing to timely complete the Project
> (defined below), pay off its mortgages, and secure approval of a
> condominium offering plan, as expressly contemplated by the Operating
> Agreement; causing or permitting damage to Claimant's condominium
> units and other portions of the Building . . . and other losses suffered by the
> Claimant.

---

[17] The same is presumably true for equity holder Prime.  The Complaint's theory is that the equity holder of Prime—Jason Carter—set up a separate company of Lazarus 5 to reap the benefit of the Defendants' actions by purchasing the Building.  As a technical matter, however, Prime is a separate corporate entity from Lazarus 5, with its own creditors in any bankruptcy proceeding.  Like all other equity holders, Prime lost its investment in the Company.  While Lazarus 5 ultimately purchased the Building in this bankruptcy proceeding, the sale was run by the Chapter 11 Trustee—an independent third-party with its own fiduciary duties to the Debtor's estate—and the sale was open to all bidders.

Proof of Claim ¶ 5, attached as Exhibit D to the Catalanello Decl.  The overlap is further

demonstrated by Little Hearts' motion to lift the automatic stay as to the Defendants, which

stated that:

> [Little Hearts] intends to assert claims against Prime and Mr. Carter arising from
> their actions in failing to complete the Project, failing to obtain approval of the
> condominium offering, and permitting the Mortgage to mature without being
> timely refinanced or paid off.  If the State Court rules in the Marks Parties' favor
> on the claims or counterclaims, then Prime and Carter (and not the Debtor) will be
> liable for Marks LP's damages. *If, on the other hand, the State Court determines
> that Prime and Mr. Carter acted properly, then Marks LP's claims against the
> Debtor would continue to exist*.

Lift Stay Motion ¶¶ 27-28 (emphasis added).

For all these reasons, the Court finds that the vast majority of the claims asserted in the

Complaint are derivative and Little Hearts lacks standing to pursue them.  As derivative claims,

the causes of action belonged to the Debtor and pursuant to the terms of the Debtor's plan and

the Creditor Trust Agreement, are now vested with the Creditor Trust.  Standing lies with the

Creditor Trustee to pursue these claims on behalf of all creditors of the Debtor's estate.  The

terms of the Debtor's confirmed plan explicitly enjoin Little Hearts from pursuing any claims

that belong to the Creditor Trust.  *See* Plan at Articles V and X and Section 2 of the Creditor

Trust Agreement.

A few of the Plaintiff's arguments are worthy of comment.  The Plaintiff argues that the

injuries they assert flow from their specific rights in the Marks Units, citing to the provisions in

the Operating Agreement granting Little Hearts the right to "retain, use, occupy [and] develop"

its designated floors.  *See Memo. of Law in Opp. to Def.s' Mot. to Dismiss* at ¶ 15 [ECF No.11].

The Plaintiff argues that the Creditor Trustee does not have standing to assert the claims in

question because he does not have a right to the Marks Units.  *See id.* at 2 and ¶¶ 7, 9.[18]  But the

Court disagrees.  The Marks Units were not distinct property rights or interests separate from the

Plaintiff's investment in the Debtor.

Rather, the Marks Units (and each other Members' designated units) represented an

agreement amongst the Members to reflect their membership interests in the Debtor.  *See*

Operating Agreement § 5 ("The respective percentage interest of the Members (the 'Percentage

Interests") of the Company shall be as set forth in Exhibit 'A'.  Each Member's Initial Capital

Contribution consists of the amount described on Exhibit 'A' as 'Initial Contribution , and as to

the Others [sic] Members, the payment of such Initial Contribution shall be made simultaneously

with the execution hereof.").  The Operating Agreement provided that Little Hearts

> shall and is hereby granted a 20% Percentage Interest in the Company, together
> with the right to retain, use, occupy, develop and acquire the condominium units
> consisting of the (i) basement/cellar and first floor, and (ii) 10th floor and roof, of
> the Building, which Percentage Interests, shall be set forth on Exhibit "A"
> annexed hereto.

Operating Agreement § 4(f)(i); *see also* Operating Agreement § 4(f)(ii) (granting Prime a 50%

Percentage Interest and the same rights with respect to the fourth, fifth, sixth, seventh and ninth

floors of the Building).  The other Members held similar rights as shareholders to their own

designated units in the Building and all experienced the same injuries with respect to the alleged

mismanagement of the Company and the loss of their interests in the Debtor.  Indeed, the

Complaint notes that the rights relied upon by the Plaintiff were essentially same for all

Members.[19]  *See* Compl. ¶ 28 (citing Operating Agreement at ¶¶ 4(F)(i)-(ii), 9(F), 9(H)).  *See,*

---

[18]    The Plaintiff also maintains that, to the extent the allegations of the Complaint also relate to harm to the
Debtor, Little Hearts does not allege or seek recovery based on such allegations.  *See Memo. of Law in Opp. to
Def.s' Mot. to Dismiss* at ¶ 16.

[19]    The Court notes that several of the cases relied on by Little Hearts in support of its argument for standing
involve cases in which a shareholder was somehow treated in a different manner from other shareholders, resulting
in direct injury to that shareholder that is distinct from other shareholders.  *See, e.g., In re Harbinger Cap. Partners*

*e.g., Vaughan v. Standard Gen. L.P.*, 63 N.Y.S.3d 44, 45-6 (App. Div. 1st Dep't. 2017)

("Because the alleged injury—a lost opportunity to realize a premium on the share price—affects

all shareholders, not only plaintiff and the putative class, these claims are derivative, rather than

direct."); *Otoka Energy, LLC v. State Street Bank & Trust Co.*, 2019 N.Y. Misc. LEXIS 3885, at

*6 (Sup. Ct. N.Y. Cty. July 10, 2019) ("Where all of a corporation's stockholders are harmed and

would recover *pro rata* in proportion with their ownership of the corporation's stock solely

because they are stockholders, then the claim is derivative in nature.") (quoting *Feldman v.*

*Cutaia*, 951 A.2d 727, 733 (Del. 2008)); *see also Yudell*, 949 N.Y.S.2d at 384 (holding that

plaintiffs' claims were derivative where joint venture first receives compensation and then

plaintiffs would be entitled to receive their proportionate share).[20]

The Plaintiff also states that any rental or sales proceeds from the Marks Units would

have been received only by Little Hearts.  *See Mem. of Law in Opp. to Def.s' Mot. to Dismiss* ¶ 8

[ECF No. 11].  But that is not accurate.  In fact, the Operating Agreement sets out a priority for

the distribution of proceeds in the event that a condominium unit in the Building were to be sold.

It is specifically structured so that all profits that the Members recognize from the sale of their

units go first to the Company and then only when a Member's obligations to the company are

fully repaid, can the Member recover on an individual basis:

---

*Funds Inv. Litig.*, 2013 U.S. Dist. LEXIS 142268, at *35 (S.D.N.Y. Sept. 30, 2013) (noting that case involved defendants "allegedly conferring an 'exclusive benefit' . . . on a subset of investors in exchange for votes intended to injure other investors" and that "allegations involving the enrichment of majority investors at the expense of the minority have been held to state direct claims."); *Gjuraj v. Uplift El. Corp.*, 973 N.Y.S.2d 172, 173-74 (App. Div., 1st Dep't 2013) (noting that plaintiff—a 15% minority shareholder—was prevented by majority shareholder from receiving profit distribution, was not informed of relocation of corporate office and was not provided with access, and was removed as a signatory on the corporate account); *Scott v. Pro Mgmt. Servs. Grp.*, LLC, 2 N.Y.S.3d 90, (App. Div., 1st Dep't 2015) (stating that claim was direct because plaintiff suffered the harm individually and noting that all other owners of the company received revenues, licensing fees and royalties except for the plaintiff).

[20]      To the extent that Little Hearts relies upon the fact that ownership rights of specific condominium units would have passed to the Members upon approval of the condominium plan, the argument fails because the condominium plan was never approved.  *See* Compl. ¶ 88 (alleging that the Defendants allowed the condominium plan to expire).

> All net sales proceeds realized from the sale of any Condominium Unit comprised of any part of the Designated Portions shall be applied and paid as follows, and in the following priority: first to the amount of the Loan allocated to such floor . . . next to the payment of all closing expenses for the sale of such individual condominium unit . . . next to the payment of all sums due hereunder; and the balance, if any, to such Member. In no event shall any Condominium Unit be conveyed unless all costs set forth above are paid.

Operating Agreement ¶ 21.2.  The sale proceeds are required to flow through the Debtor in satisfaction of its debt obligations and any recovery by Little Hearts is entirely dependent on such satisfaction, indicating that the Members interests int the Debtor represent a pure equity ownership.

In sum, therefore, the claims asserted in the Complaint are all grounded in allegations of the Defendants mismanaging the Company and the loss of the Debtor's sole asset, the Building. Clearly these injuries all flowed directly from the alleged injuries caused to the Company.  Little Hearts would be unable to show that these injuries arose independent of the injuries sustained by the Company.  *See Beatrice Invs., LLC*, 2018 N.Y. Misc. LEXIS 2008, at *25; *Abrams*, 66 N.Y.2d at 953; *1993 Trust of Joan Cohen*, 2017 N.Y. Misc. LEXIS 1667, at *6; *Yudell*, 949 N.Y.S.2d at 384.

Even if the Plaintiff might establish independent injury by virtue of the Marks Units, such claims would be so "confused with or embedded in" a harm to the Company, it cannot be maintained as a direct claim.  *Serino*, 994 N.Y.S.2d at 69 (noting that "claim must be factually supportable by more than complaints that conflate [claimant's] derivative and individual rights"); *see also Abrams*, 66 N.Y.2d at 953.  That is because any such injuries are all based on the same alleged mismanagement of the Company and the resulting sale of the Building to Lazarus 5. Said another way, the alleged wrongful conduct that injured the Marks Units is the same conduct that would have caused injury to the units of Onestone or Thaddeus Pollack.

There are only two instances where the injury and damages are arguably personal to

Little Hearts and distinct from its rights as a Member under the Operating Agreement.  The first

of these is the loss of the Lease and the Sublease with the Spa, a business arrangement that

appears to have been unique to Little Hearts.  Under the Lease and Sublease, Little Hearts

appears to have been the only Member with a tenant in its designated space.  But once again, any

determination of claims relating to the Lease and Sublease are "confused with or embedded in"

the alleged harm caused by the Defendants mismanagement of the Company and Building.

*Serino*, 994 N.Y.S.2d at 69.  Accordingly, such a claim cannot be maintained as a direct claim.

*See id.* (noting that "claim must be factually supportable by more than complaints that conflate

[claimant's] derivative and individual rights"); *see also Yudell*, 949 N.Y.S.2d at 384 ("To the

extent, if any, that plaintiffs have asserted direct claims, they are embedded in an otherwise

derivative claim for partnership waste and mismanagement."); *Abrams*, 66 N.Y.2d at 953 ("A

complaint the allegations of which confuse a shareholder's derivative and individual rights will . .

. be dismissed."); *Nisselson v. Marjerry Realty Corp. (In re Port Morris Tile & Marble LP)*,

*Memorandum Opinion and Order Denying Pl.'s Mot. for Prelim. Injunction* [Adv. Pro. No. 22-

01137, ECF No. 14] (Bankr. S.D.N.Y. Oct. 6, 2022) ("[E]ven if the trustee cannot bring the

exact claim as a creditor, the creditor's claim may still be general where the trustee is

empowered to bring actions based on the same factual harm alleged by the creditor.") (citing *In

re Madoff*, 818 F. App'x 48 (2d Cir. 2020) (finding plaintiffs' claims for control person liability

under federal securities law to be "duplicative or derivative of the claims brought by the Trustee,

or which could have been brought by the Trustee.").  The other injury that appears to be personal

to Little Hearts relates to its alleged wrongful removal as Manager of the Building.  *See, e.g.,*

Compl. ¶ 88 ("Improperly removing Little Hearts as Manager through false representations to the

Court *ex parte* to obtain a TRO appointing Carter and Prime as Managers without notice or a

hearing to Little Hearts or any other Member."); *see also id.* ¶¶ 97, 106, 122.  To the extent that

the injuries alleged by Little Hearts relate only to its removal as Manager—as opposed to alleged

harm as a Member—then these claims are individual and may proceed if properly plead as

distinct.  But to the extent that such an alleged wrong seeks damages to the value of Little

Hearts' interest as a Member—as the Complaint does now—the Court finds those claims to be

derivative for the reasons discussed above.[21]

## CONCLUSION

For the reasons stated above, the Defendants' Motion to Dismiss is granted.  Given the

dismissal of the Adversary Proceeding, the Court denies the Plaintiff's Remand Motion as moot.

The Defendants should settle an order on five days' notice.  The proposed order must be

submitted by filing a notice of the proposed order on the Case Management/Electronic Case

---

[21]         In reaching its decision, the Court rejects the argument of the Defendants that Little Hearts "lost" its right
to retain, use, occupy and develop the Marks Units due to a stipulation entered between Little Hearts and the
Creditor Trustee, which provides that:

> **Delivery of Possession/Access/Removal of Property.** (a) [Little Hearts] will be deemed to have
> surrendered possession of any premises subject to the Leases including but not limited to the
> cellar, basement, first floor, and tenth floor units upon the Effective Date, except as provided in
> the next sentence; (b) LHMF shall be deemed to have surrendered possession of the second floor
> unit effective as of the 30th day after the date the State of New York's COVID-19 'stay at home'
> restrictions (under Governor Cuomo's executive orders) have been lifted; (c) LHMDF shall be
> permitted access to the second and tenth floor units up until 30 days after the date the State of New
> York's COVID-19 'stay at home' restrictions (under Governor Cuomo's executive orders) have
> been lifted to remove its property, furniture, tools and other items which were properly
> documented to the Tree's satisfaction to have been purchased by LHMF, its non-debtor affiliates
> and/or principals located in such units.

*Stip. By and Between Kenneth P. Silverman, Operating Chapter 11 Trustee for the Debtor and Little Hearts Marks
Family II L.P.* ¶ 6 [Case No. 19-1911, ECF No. 183]; *see also Order Approving Stip. By and Between Kenneth P.
Silverman, Operating Chapter 11 Trustee for the Debtor and Little Hearts Marks Family II L.P.* at [Case No. 19-
11911, ECF No. 209].  While this language provides for the surrender of Little Hearts' possessory interest, the
Defendants have not pointed to language that deprives Little Hearts of any claims that it may have as a result of the
parties' prior conduct.

Filing docket, with a copy of the proposed order attached as an exhibit to the notice.  A copy of

the notice and proposed order shall also be served upon opposing counsel.

Dated: White Plains, New York
        October 11, 2022

                                        */s/ Sean H. Lane*
                                        UNITED STATES BANKRUPTCY JUDGE